NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

CHELSIE H., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, A.H., *Appellees*.

No. 1 CA-JV 19-0425
FILED 8-25-2020

Appeal from the Superior Court in Maricopa County
No. JD530244
The Honorable Jennifer E. Green, Judge

**AFFIRMED**

COUNSEL

Robert D. Rosanelli, Attorney at Law, Phoenix
By Robert D. Rosanelli
*Counsel for Appellant*

Arizona Attorney General's Office, Mesa
By Amanda Adams
*Counsel for Appellee Department of Child Safety*

---

**MEMORANDUM DECISION**

Judge Kent E. Cattani delivered the decision of the Court, in which Presiding Judge Paul J. McMurdie and Judge Jennifer B. Campbell joined.

---

**C A T T A N I**, Judge:

**¶1**        Chelsie H. ("Mother") appeals the superior court's order terminating her parental rights to her daughter A.H.  For reasons that follow, we affirm.

### FACTS AND PROCEDURAL BACKGROUND

**¶2**        Mother gave birth to An.H. in May 2016.  By August, the Department of Child Safety ("DCS") filed a dependency petition based on Mother's erratic behavior and neglect of An.H., alleging that Mother's mental illness prevented her from parenting An.H.  In November 2016, the superior court found An.H. to be dependent as to Mother and ordered a case plan of family reunification.

**¶3**        DCS provided Mother with various services, including urinalysis testing, counseling, therapy, a parent aide, and transportation.  But Mother's participation and engagement with these services were limited.  For example, Mother missed 9 of her 26 urinalysis testing appointments between November 2017 and January 2018 and missed all of her weekly scheduled tests after January 2018.  DCS also referred Mother for masters-level individual counseling in December 2016, but the referral was closed due to lack of participation.  In November 2016, DCS referred Mother for a psychological evaluation, which was not completed until February 2017 after Mother missed three prior appointments.

**¶4**        Dr. Nicole Huggins conducted Mother's February 2017 psychological evaluation.  During this evaluation, Mother described her extensive history as a victim of abuse and reported that she had been diagnosed with bipolar disorder, attention deficit hyperactivity disorder, and post-traumatic stress disorder.  The evaluation further revealed that Mother demonstrated signs of mild cognitive impairment.  Dr. Huggins opined that based on Mother's level of cognitive functioning, she would likely require a multimodal approach to understand instructions presented to her, such as sending reminders through both voicemail and email.  She

also concluded that Mother's mental conditions would continue for a prolonged and indefinite period. Dr. Huggins recommended that Mother receive, among other things, a psychiatric evaluation, a neuropsychological evaluation, and PhD-level therapy. She further opined that if Mother failed to participate in services tailored to address her issues, Mother's prognosis for becoming a minimally adequate parent was poor.

¶5 DCS referred Mother for a psychiatric evaluation in April 2017, but Mother missed her appointment. DCS also referred Mother for a neuropsychological evaluation in May 2017, and Mother missed two appointments before completing the evaluation in August 2017.

¶6 Dr. Robert Mastikian conducted Mother's August 2017 neuropsychological evaluation. At the time, Mother was 11 weeks pregnant with A.H., and Dr. Mastikian's diagnosed Mother as suffering from a moderate intellectual disability disorder and post-traumatic stress. Dr. Mastikian determined that Mother's prognosis of becoming a minimally adequate parent was poor and that her condition would likely continue for a prolonged and indefinite period. Dr. Mastikian recommended that Mother get a psychiatric evaluation and participate in individual therapy with the dialectical behavioral therapy approach. He also recommended that her treatment be provided by professionals proficient in working with intellectually disabled adults who have undergone chronic and severe abuse.

¶7 Mother was scheduled to have her first PhD-level individual counseling session in August 2017, but she missed three appointments before completing an intake in October 2017. She failed to appear for an appointment after her intake, and counseling was closed out for lack of participation.

¶8 Mother was provided a second referral for parent aide services beginning in November 2017, but the referral was closed unsuccessfully in May 2018 after she completed only 6 out of 18 skill sessions. Mother's previous referral had also been closed unsuccessfully.

¶9 Because of her failure to meaningfully participate in the services provided, DCS moved to terminate Mother's rights to An.H. in September 2017 on the statutory grounds of mental illness and six-months' time in care. *See* A.R.S. § 8-533(B)(3), (8)(b).

¶10 Mother gave birth to A.H. in February 2018. Shortly after A.H. was born, DCS took A.H. into care after receiving a report that Mother displayed erratic and aggressive behaviors while caring for A.H. DCS filed

a dependency petition alleging that Mother was unable to parent A.H. due to mental illness.

¶11     After a three-day consolidated hearing on severance as to An.H. and dependency as to A.H., the superior court terminated Mother's parental rights to An.H. and found A.H. dependent as to Mother.

¶12     Around September 2018, DCS completed a home safety inspection to determine whether in-home visitation between Mother and A.H. would be appropriate, but Mother's caseworker concluded that in-home visitation would not be appropriate due to the unsafe condition of the home. Throughout the process, Mother had also been receiving supervised visitation with A.H. Mother's participation was inconsistent, and she stopped visiting A.H. entirely beginning in November 2018. Mother was not prepared for the visits in which she participated, and there were issues regarding Mother's use of inappropriate language around A.H. and her lack of engagement in holding or feeding A.H.

¶13     In December 2018, DCS moved to terminate Mother's parental rights to A.H. on the grounds of mental illness, prior termination, and six- and nine-months' time in care. *See* A.R.S. § 8-533(B)(3), (8)(a)–(b), (10).

¶14     In September 2019, the court held a three-day contested termination adjudication hearing. The court then issued a 22-page minute entry terminating Mother's parental rights as to A.H., finding a statutory basis for severance on all four grounds alleged and finding that severance would be in A.H.'s best interests. Mother timely appealed, and we have jurisdiction under A.R.S. § 8-235(A).

## DISCUSSION

¶15     The superior court may terminate a parent–child relationship if clear and convincing evidence establishes at least one statutory ground for severance and a preponderance of the evidence shows severance to be in the child's best interests. A.R.S. § 8-533(B); *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 22 (2005). We review the superior court's severance ruling for an abuse of discretion, deferring to its factual findings unless no reasonable evidence exists to support them. *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004); *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002).

¶16     Before seeking severance, DCS generally must make reasonable efforts to preserve the family by providing the parent

rehabilitative services, including those services recommended by its consulting experts.[1] *Mary Lou C.*, 207 Ariz. at 49, ¶ 15; *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 186–87, 192, ¶¶ 1, 33–34, 37 (App. 1999). "A 'reasonable effort' requires DCS 'to undertake measures with a reasonable prospect of success.'" *Donald W. v. Dep't of Child Safety*, 247 Ariz. 9, 22, ¶ 46 (App. 2019) (citation omitted). DCS need not, however, provide "every conceivable service" or undertake measures that would prove futile. *Mary Ellen C.*, 193 Ariz. at 192, ¶¶ 34, 37; *Maricopa Cty. Juv. Action No. JS-501904*, 180 Ariz. 348, 353 (App. 1994).

**¶17** Mother argues that DCS failed to implement all of Dr. Mastikian's recommendations and that the superior court thus erred by finding that DCS made diligent efforts to provide her with appropriate reunification services. *See Mary Ellen C.*, 193 Ariz. at 192, ¶ 37. She first asserts that DCS failed to follow Dr. Mastikian's recommendation that Mother receive PhD-level counseling. But Mother was scheduled for PhD-level counseling even before Dr. Mastikian's August 2017 report. She failed to show up for that appointment and two subsequent appointments that post-dated Dr. Mastikian's report. And although she completed her intake in October 2017, she failed to attend subsequent appointments and was closed out for lack of contact and engagement. *See JS-501904*, 180 Ariz. at 353 (noting that DCS "is not required . . . to ensure that a parent participates in each service it offers").

**¶18** Second, Mother argues that DCS failed to implement Dr. Mastikian's recommendation to, ostensibly, "provide [Mother] with case managers 'who are proficient in working with intellectual[ly] disabled adults who have undergone chronic and severe abuse in order to ensure that materials are learned and retained.'" Dr. Mastikian's recommendation, however, applied to Mother's mental-health treatment providers, not to her DCS case managers.

**¶19** Finally, Mother argues that DCS failed to follow Dr. Mastikian's recommendation to refer Mother for a psychiatric evaluation. Although DCS did not specifically provide another referral for a psychiatric evaluation after Dr. Mastikian's recommendation, DCS had already referred Mother for a psychiatric evaluation in April 2017, and Mother

---

[1] DCS argues that no showing of diligent efforts to provide appropriate reunification services is necessary to support severance on the statutory ground of prior termination. Because we affirm the superior court's finding that DCS made such diligent efforts in this case, however, we need not consider this argument.

failed to show up. Further, Mother's existing mental-health service provider reported that "they [were] able to provide as many services as [Mother was] wanting to participate in," including psychiatric evaluations. She did not, however, take advantage of that available service.

¶20 Considering the record as a whole, reasonable evidence supports the superior court's finding that DCS was diligent in providing appropriate reunification services. DCS provided Mother with numerous services throughout the dependency regarding An.H. as well as A.H.'s dependency. DCS also followed Dr. Huggins's recommended multimodal approach to communicating with Mother by attempting to contact Mother using both phone calls and emails. But Mother's participation in these services ranged from inconsistent to nonexistent, and "DCS is not required to leave the window of opportunity for remediation open indefinitely." *Tanya K. v. Dep't of Child Safety*, 240 Ariz. 154, 157, ¶ 11 (App. 2016). Accordingly, the superior court did not abuse its discretion by concluding that DCS made reasonable efforts to provide Mother services.

**CONCLUSION**

¶21 For the foregoing reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED: AA