NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS

## DIVISION ONE

KIMBERLY R., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, R.R., *Appellees*.

No. 1 CA-JV 22-0007
FILED 5-31-2022

Appeal from the Superior Court in Maricopa County
No. JD39073
The Honorable Michael D. Gordon, Judge

**AFFIRMED**

COUNSEL

Maricopa County Public Advocate, Mesa
By Suzanne W. Sanchez
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Autumn Spritzer
*Counsel for Appellee Department of Child Safety*

---

## MEMORANDUM DECISION

Judge Angela K. Paton delivered the decision of the Court, in which Presiding Judge Paul J. McMurdie and Vice Chief Judge David B. Gass joined.

---

**P A T O N**, Judge:

**¶1**        Kimberly R. ("Mother") appeals the superior court's order terminating her parental rights to her child, R.R.[1]  We affirm.

### FACTS AND PROCEDURAL HISTORY

**¶2**        In September 2019, the Department of Child Safety ("DCS") received reports alleging R.R. was born substance-exposed to marijuana. DCS investigated and although it did not confirm the allegations were true, it learned that Mother suffered from untreated mental illness.

**¶3**        In January 2020, Mother lived in Phoenix with her paternal grandmother ("Grandmother B.").  DCS was concerned about Mother's mental health and recommended a safety plan where R.R. would be in daycare when Grandmother B. was not home to assist Mother.  In response, Mother threatened to kill herself.  DCS obtained court authorization to remove R.R. and placed her in a licensed foster care home.  In February 2020, the superior court found R.R. dependent as to Mother.  DCS provided numerous services to Mother, including a parent aide, psychological and psychiatric evaluations, therapy, visitation, and transportation.

**¶4**        A psychologist evaluated Mother in March 2020 and reported that her ability to effectively parent depended on her mental health, which deteriorated when Mother failed to take medication, attend therapy, or lacked a supportive environment.  The psychologist recommended Mother receive therapy and medication.

**¶5**        That same month, DCS helped Mother obtain mental health services at Lifewell, a behavioral health provider she had previously used. Mother completed intake and received medication management but was unable to schedule therapy due to COVID-19.

---

[1] We use initials to protect the child's privacy.

¶6            In November 2020, Mother moved to Casa Grande to live with her maternal grandmother ("Grandmother R."). The superior court placed R.R. with Grandmother R., and R.R. began living with the two of them in December 2020. DCS helped Mother enroll with a local behavioral health provider, Horizon, in February 2021. Mother complied with Horizon's medication management and attended therapy intake but only attended one therapy session in March 2021. Mother did not attend any parenting classes offered by Horizon.

¶7            Before Mother moved to Casa Grande, she participated in parent aide services. The first parent aide informed DCS that it needed more time to work with Mother to enhance protective capacities and recommended DCS submit a second parent aide referral. DCS did so, and the second parent aide was assigned in September 2020. The second parent aide closed out unsuccessfully in March 2021 because Mother became easily overwhelmed when caring for R.R. and screamed at R.R. when R.R. cried.

¶8            In June 2021, Mother went to the emergency room due to a mental health crisis. She subsequently moved back to Phoenix. Meanwhile, R.R. was placed with a kinship placement. DCS continued to provide Mother visitation and transportation. DCS offered to help Mother transfer her mental health services to Phoenix, but Mother said she was taking care of it and "wanted to try to do things on [her] own."

¶9            During a meeting with DCS in late August 2021, Mother indicated she had difficulty contacting Horizon to transfer treatment locations. DCS contacted Mother's insurance and provided her with a list of facilities. Mother eventually went to TERROS but stopped going because she "did not like it," a fact DCS was unaware of at the time. Mother later told DCS she was continuing her treatment at a Horizon facility, was back on her medication, and waiting for her therapist assignment. DCS offered to contact the Horizon case manager to facilitate the therapist assignment, but Mother did not have the contact information.

¶10           At the August meeting, Mother also told DCS she had difficulty refilling her medication since the move. The DCS case manager discussed the importance of medication and told Mother she could obtain a refill by going to emergency rooms or urgent care. Mother later testified she could not obtain a refill from emergency rooms. But she did not inform DCS she could not get a refill and DCS believed she was set up at TERROS. Ultimately, Mother did not take her medication from July 2021 to October 2021.

**¶11**     In August 2021, DCS moved to terminate Mother's parental rights under the mental illness and fifteen-month out-of-home placement grounds.  *See* A.R.S. § 8-533(B)(3), (8)(c).  Following a trial in November 2021, the superior court terminated Mother's parental rights on both grounds.

**¶12**     Mother timely appealed.  We have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution and A.R.S. §§ 8-235(A), 12-120.21(A)(1), and -2101(A)(1).

## DISCUSSION

**¶13**     Mother's sole argument on appeal is that DCS failed to make diligent reunification efforts to address her mental illness.  For the following reasons, we determine that reasonable evidence supports the superior court's finding that DCS made diligent efforts to provide appropriate reunification services to Mother.

**¶14**     Parents' rights to raise their children as they see fit are fundamental, but not absolute.  *Minh T. v. Ariz. Dep't of Econ. Sec.*, 202 Ariz. 76, 79, ¶ 14 (App. 2001).  "The [superior] court, as the trier of fact in a termination proceeding, is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and make appropriate findings."  *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002).  As such, if reasonable evidence supports the court's factual findings, we will affirm its termination order unless such findings are clearly erroneous.  *Minh T.*, 202 Ariz. at 78-79, ¶ 9 (citation omitted).

**¶15**     Before terminating parental rights under A.R.S. § 8-533(B), the superior court must find by clear and convincing evidence that DCS made diligent reunification efforts.  A.R.S § 8-533(B)(8); *see Jennifer G. v. Ariz. Dep't of Econ. Sec.*, 211 Ariz. 450, 453, ¶ 12 (App. 2005) ("[T]he [superior] court must also have found that [DCS] had made reasonable efforts to reunify the family or that such efforts would have been futile.").  "DCS is not required to provide every conceivable service or to ensure that a parent participates in each service it offers . . . ."  *Tanya K. v. Dep't of Child Safety*, 240 Ariz. 154, 157, ¶ 11 (App. 2016) (citation and internal quotation marks omitted).  Rather, DCS is obligated to provide parents the "time and opportunity to participate" in services that have a "reasonable prospect of success."  *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶¶ 34-37 (App. 1999).  DCS fails to make reasonable efforts when it "neglects to offer the very services that its consulting expert recommends."  *Id.*  Making reasonable efforts "includes seeking to reasonably accommodate disabilities from

which a parent may suffer." *Jessica P. v. Dep't of Child Safety*, 251 Ariz. 34, 39, ¶ 15 (App. 2021) (citation omitted).

¶16 Mother argues DCS failed to make appropriate accommodations under the Americans with Disabilities Act ("ADA") to account for her mental health issues. *See* 42 U.S.C. §§ 12101–12213. In *Jessica P.*, however, this court held that "Arizona's statutory requirement that DCS make reasonable efforts to provide reunification services satisfies the ADA's reasonable accommodation requirement." 251 Ariz. at 39, ¶ 15 (citation omitted). In other words, DCS's duty to provide "reasonable accommodations" is akin to making "reasonable efforts" and thus, we do not apply a different standard. *See id.* (citation omitted).

¶17 Mother testified that DCS helped her find appropriate services to address her mental health and ability to parent R.R. since its first contact in September 2019. Despite Mother's multiple moves, DCS continually helped Mother establish mental health services, provided insurance assistance, and transportation. Additionally, Mother testified that at times she declined DCS's help because she wanted to arrange things herself.

¶18 Mother also claims DCS was required to provide her with a parent aide qualified to work with parents with mental illness. Although the DCS case manager testified that having such a parent aide would be "beneficial," DCS was not required to provide one. *See Maricopa Cnty. Juv. Action No. JS-501904*, 180 Ariz. 348, 353 (App. 1994) (DCS is "not required to provide every conceivable service.").

¶19 Mother next contends that DCS failed to help her develop a proper safety plan to address her mental health "flare up[s]." DCS, however, did attempt to implement a safety plan for Mother. Mother even acknowledged that her mental health providers helped her develop a plan. She testified that she developed the ability to identify when she felt she was going into a crisis and the plan of action she would follow when she found herself in crisis.

¶20 The superior court's ruling misstates that Mother received individual therapy at Lifewell. The record shows that Mother was unable to receive therapy at Lifewell due to COVID-19. Nonetheless, when Mother subsequently lived in Casa Grande, the recommended mental health services were available, including therapy at Horizon, but she only participated in an intake session and one therapy session despite additional appointments being scheduled and available.

**¶21** The record shows DCS persisted in its efforts to provide Mother reasonable services and provided her the "time and opportunity to participate" in services. *See Mary Ellen C.*, 193 Ariz. at 192, ¶ 37. DCS helped Mother work through her insurance changes and found her local behavioral health providers after each move. It provided her two parent aides with a third readily available that Mother declined to utilize. DCS met with Mother on multiple occasions to address issues and identify solutions. Although she could not schedule therapy for much of 2020 due to COVID-19, she only attended one session when she subsequently had access to therapy. DCS is not required to "leave the window of opportunity for remediation open indefinitely." *See Tanya K.*, 240 Ariz. at 157, ¶ 11.

## CONCLUSION

**¶22** We affirm.



AMY M. WOOD • Clerk of the Court
FILED:    AA