NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

IN RE TERMINATION OF PARENTAL RIGHTS AS TO C.H.

No. 1 CA-JV 24-0033

FILED 08-01-2024

---

Appeal from the Superior Court in Maricopa County
No. JD527370
The Honorable Pamela S. Gates, Judge

**VACATED AND REMANDED**

---

COUNSEL

David W. Bell Attorney at Law, Higley
By David W. Bell
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Thomas K. Sanders
*Counsel for Appellee DCS*

Law Office of Lincoln Green Jr. PC, Phoenix
By Lincoln Green
*Counsel for Appellee Child*

_____

**MEMORANDUM DECISION**

Presiding Judge Michael S. Catlett delivered the decision of the Court, in which Judge Jennifer M. Perkins and Vice Chief Judge Randall M. Howe joined.

_____

**C A T L E T T**, Judge:

¶1          Chyneika H. ("Mother") appeals the juvenile court's termination of her parental rights as to C.H. ("Child"). Because the record does not adequately support the juvenile court's findings that the Department of Child Safety ("DCS") made reasonable efforts to reunify the family or that further reunification services would be futile, we vacate the court's order terminating Mother's parental rights and remand for further proceedings.

**FACTS AND PROCEDURAL HISTORY**

¶2          Mother has an extensive history with DCS. She has had her parental rights to multiple children terminated. In prior proceedings, Mother failed to participate adequately in DCS's reunification services. Most recently, in late 2022, the juvenile court terminated her parental rights to two children because (1) they were in out-of-home-placement for longer than fifteen months and (2) the court had terminated Mother's parental rights within the prior two years for the same cause (untreated mental health issues and diminished caregiver abilities).

¶3          In July 2022, Mother gave birth to Child. In May 2023, DCS petitioned to have Child deemed dependent because Mother did not provide proper and effective parental care and control due to mental health issues. The court found Child dependent as to Mother. In late 2023, DCS petitioned to terminate Mother's parental rights on two grounds: first, mental illness, and second, Mother's parental rights to another child were terminated within the preceding two years for the same cause. *See* A.R.S. § 8-533(B)(3), (B)(10). We refer to the first ground as the "mental illness ground," and the second as the "prior termination ground."

¶4          To establish the mental illness ground, DCS relied on a psychological evaluation conducted in 2020 during termination

proceedings involving a different child. Based on that evaluation, DCS asserted in 2023 that there was still a "substantial likelihood that Mother will not be capable of exercising proper and effective parental care and control in the near future" for Child. To support the prior termination ground, DCS noted that "Mother had her parental rights terminated [on] October 12, 2022 due to ongoing concerns of untreated mental health and diminished caregiver protective capacities."

¶5　　　　　DCS called two witnesses during the termination hearing in this case—Mother's DCS case manager and the psychologist who evaluated Mother in 2020. The psychologist testified that she had diagnosed Mother with a personality disorder (with schizoid and avoidant characteristics), a depressive disorder, and borderline intellectual functioning. The psychologist's report (issued in January 2021) also diagnosed Mother with child neglect and post-traumatic stress disorder ("PTSD"). The psychologist's opinion, based on the 2020 evaluation, was that Mother's prognosis to safely parent her other child in the foreseeable future was poor. She recommended that Mother receive PhD-level counseling and thought Dialectical Behavior Therapy ("DBT") would help Mother's personality disorder. She also recommended that Mother receive enhanced attachment-based, parent-child therapy.

¶6　　　　　The psychologist testified that she would have concerns about Mother's ability to parent Child if Mother had been inconsistent with therapy during the intervening time since her 2020 diagnoses. When asked if she would be concerned if DCS never referred Mother to participate in DBT, the psychologist replied: "Yes. I'd want to know why that . . . didn't happen because it's an important part." The psychologist also testified that it could have benefited Mother to have an updated psychological evaluation.

¶7　　　　　During the summer of 2023, Mother, on her own, saw a mental health service provider, which conducted a psychiatric evaluation and provided her with therapy. That provider diagnosed Mother with Alcohol Use Disorder, Mood Disorder (Bipolar), and PTSD. Mother attended two therapy sessions and missed four others. DCS did not communicate with Mother's therapist or obtain her mental health records until after petitioning for termination.

¶8　　　　　The DCS case manager admitted that he had limited knowledge of Mother's current mental health condition and that "[t]here's not a lot of information[.]" He admitted DCS "relied heavily" on 2019 and 2020 psychological evaluations in its allegations. And he admitted that DCS

did not completely follow the recommendations the medical experts made in those reports. The case manager further acknowledged DCS had no documentation to suggest the diagnoses stemming from the 2020 evaluation remained applicable in 2023. Comparing the diagnoses from DCS's prior psychological evaluations to the diagnoses Mother received from her private mental health provider in 2023, only one diagnosis (PTSD) overlapped.

¶9             The case manager testified that DCS did not refer Mother for PhD-level counseling in this case because "communication has been inconsistent" and DCS did not "have an actual understanding of what . . . counseling . . . [Mother] was doing." The case manager said DCS needed more information about the type of counseling Mother was receiving to determine if a referral for a different type of counseling was required.

¶10           The only reunification service DCS provided Mother with respect to Child was visitation. DCS initially stopped visitation within one week because no visits took place. But shortly thereafter Mother began attending visits more consistently.

¶11           Following the hearing, the juvenile court terminated Mother's parental rights as to Child. The court reasoned that it "heard credible testimony from [the 2020 evaluating psychologist] that proved, by clear and convincing evidence, [Mother] is unable to discharge her parental responsibilities due to mental illness and mental deficiency." The court further said that "credible evidence testimony proved that [Mother's] level of participation and commitment is inadequate to address her mental illness and mental deficien[cy]." The court found "that referral for additional services would have been futile[,]" because "[t]hroughout numerous dependencies including this one, [Mother] has failed to consistently participate in any service or therapy offered by [DCS]." The court also concluded DCS had proven by a preponderance of the evidence that terminating Mother's rights was in Child's best interests.

¶12           Mother timely appealed. We have jurisdiction. *See* A.R.S. § 8-235(A).

## DISCUSSION

¶13           Mother appeals the termination of her parental rights, arguing the court erred in finding that DCS made reasonable efforts to reunify her family and that further reunification efforts would be futile.

## I.     Waiver

**¶14**         DCS first argues Mother waived her argument that DCS failed to make reasonable reunification efforts by failing to object to its services throughout the dependency.  Generally, an issue is waived on appeal if a party fails to raise an argument in the juvenile court.  *Aleise H. v. Dep't Child Safety*, 245 Ariz. 569, 573 ¶ 12 (App. 2018).

**¶15**         Here, Mother raised the issue of insufficient reunification services in the juvenile court.  In fact, a significant portion of the termination hearing was dedicated to whether DCS had provided sufficient services, with Mother arguing that it had not.  The issue was, therefore, properly raised and argued before the juvenile court, which was able to decide whether DCS provided sufficient services.

**¶16**         DCS relies on *Bennigno R. v. Arizona Department of Economic Security* and *Shawanee S. v. Arizona Department of Economic Security* to support its waiver argument.  But in both cases the parent challenging termination *never argued* insufficient services to the juvenile court.  In *Bennigno R.*, the court explained that the parent "maintained during closing arguments that the sole issue for the court to decide was whether termination of his rights was in the children's best interests," and not whether sufficient reunification services were provided.  233 Ariz. 345, 349–50 ¶ 19 (App. 2013).  Similarly, in *Shawanee S.*, the court noted that "at the termination hearing, Mother did not argue that ADES failed to make reasonable efforts to provide appropriate reunification services."  234 Ariz. 174, 179 ¶ 17 (App. 2014).

**¶17**         Moreover, there is a stark difference between the insufficient services arguments in *Benningo R.* and *Shawanee S.* and that in this case.  In those cases, DCS provided a multitude of services.  *See Benningo R.*, 233 Ariz. at 349 ¶ 19 (quoting the juvenile court's finding that DCS provided "psychological evaluations, visitation, counseling, parenting classes, substance abuse treatment, and urinalysis testing"); *Shawanee S.*, 234 Ariz. at 176 ¶ 4 (explaining that "ADES offered Mother a psychological evaluation and consultation, individual counseling, parent aide services (including parenting education and supervised visitation), and transportation").  Yet the parents argued they were entitled to more.

**¶18**         Here, Mother did not neglect to raise her insufficient services argument with the juvenile court.  She squarely raised the issue, and the juvenile court addressed it.  *See Shawanee S.*, 234 Ariz. at 179 ¶ 18 (applying waiver ensures the juvenile court had "a reasonable opportunity to address

the matter and ensure that ADES was in compliance with its obligation to provide appropriate reunification services as ordered by that court"). Moreover, unlike in *Benningo R.* and *Shawanee S.*, Mother is not complaining that DCS, while providing some services, should have provided more. Instead, Mother argues that DCS "seemingly relied on Mother'[s] past failings as reason not to follow through with any recommended services in the present case." Because Mother also made that argument in the juvenile court, we address its merits. *See Adams v. Valley Nat'l Bank of Ariz.*, 139 Ariz. 340, 342 (App. 1984) (courts prefer to decide cases on their merits).

## II.   Reunification Efforts

**¶19**        Mother asserts the juvenile court erred in finding that DCS made reasonable efforts to reunify her with Child. To terminate a parent's rights, the juvenile court must find by clear and convincing evidence that at least one of the grounds in § 8-533(B) exists and must find by a preponderance of the evidence that termination is in the child's best interests. *Kent K. v. Bobby M.*, 210 Ariz. 279, 288 ¶ 41 (2005); *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 249 ¶ 12 (2000). This court "will affirm a termination order unless the juvenile court abuses its discretion or the court's findings are not supported by reasonable evidence." *Timothy B. v. Dep't of Child Safety*, 252 Ariz. 470, 474 ¶ 14 (2022). We will accept the juvenile court's factual findings if supported by reasonable evidence and inferences. *Brionna J. v. Dep't of Child Safety*, 255 Ariz. 471, 478 ¶ 30 (2023). We will not disturb the juvenile court's conclusions for insufficient evidence unless no one could reasonably find the evidence to be sufficient. *Id.* at 479 ¶ 31.

**¶20**        "Arizona courts have long required the State, in mental-illness-based severances, as in others, to demonstrate that it has made a reasonable effort to preserve the family." *Mary Ellen C. v. Ariz. Dep't of Econ. Serv.*, 193 Ariz. 185, 192 ¶ 33 (App. 1999). Such efforts are also required when DCS seeks termination under the prior termination ground. *See, e.g.*, *Tanya K. v. Dep't of Child Safety*, 240 Ariz. 154, 157 ¶ 11 (App. 2016).

**¶21**        When services are required, DCS must provide the time and opportunity for parents to participate in programs directed toward reunification but "need not provide every conceivable service[.]" *Jessica P. v. Dep't of Child Safety*, 251 Ariz. 34, 39 ¶ 17 (App. 2021). Nor must DCS ensure parent participation in provided services or leave the reunification window open indefinitely. *Maricopa Cnty. Juv. Action No. JS-501904*, 180 Ariz. 348, 353 (App. 1994); *Maricopa Cnty. Juv. Action No. JS-501568*, 177 Ariz. 571, 577 (App. 1994). But services must be "designed to improve the

parent's ability to care for the child." *Jordan C. v. Ariz. Dep't of Econ. Ser.*, 223 Ariz. 86, 94 ¶ 20 (App. 2009). When reviewing reunification services, we must ask whether "no other services could be provided which had not already been offered that might preserve the family." *Pima Cnty. Severance Action No. S-2397*, 161 Ariz. 574, 577 (App. 1989).

**¶22** Here, DCS did not make reasonable reunification efforts to provide services to Mother. *See* A.R.S. § 8-846(A). To the contrary, DCS provided Mother only with visitation. Most importantly, DCS neglected to provide Mother with an updated psychological evaluation, which was essential to determining whether Mother's parental rights should be terminated under the mental illness or prior termination grounds.

**¶23** In pertinent part, the mental illness ground required DCS to show that Mother is unable to discharge parental responsibilities due to *mental illness*. *See* A.R.S. § 8-533(B)(3). Similarly, under the prior termination ground, DCS was required to show that Mother had her parental rights to at least one other child terminated within the preceding two years for the *same cause* — which here, was for mental illness. *See* A.R.S. § 8-533(B)(10). Thus, DCS was responsible for providing services related to improving Mother's mental health with the aim of enhancing her parenting abilities and preserving the family. *See Mary Ellen C.*, 193 Ariz. at 192 ¶ 33 ("Arizona courts have long required the State, in mental-illness-based severances, as in others, to demonstrate that it has made a reasonable effort to preserve the family.").

**¶24** Mother's DCS case manager acknowledged "[t]here [was] not a lot of information" about Mother's mental health status at the time of the termination hearing. The psychologist who previously evaluated Mother in 2020 testified that Mother could have benefited from an updated psychological evaluation before DCS pursued termination. DCS argues, however, that "Mother never requested an updated psychological evaluation." That argument misses the mark. The onus was on DCS to provide appropriate mental-health services, not on Mother to request them. *See id.* at 186 ¶ 1 ("It is well established that the State, before acting to terminate parental rights, has an affirmative duty to make all reasonable efforts to preserve the family relationship.").

**¶25** Moreover, DCS's retained expert recommended Mother receive PhD-level counseling/treatment, DBT, and enhanced attachment-based, parent-child therapy. Mother's case manager acknowledged DCS did not follow those recommendations and DBT was never provided. *See id*. at 192 ¶ 37 (explaining DCS does not provide sufficient opportunities to

a parent or make a "concerted effort to preserve" the family "when it neglect[s] to offer the very services that its consulting expert recommends.").

**¶26**        The case manager testified that, "until . . . recently," DCS did not "have an actual understanding of what . . . counseling . . . [Mother] was doing." The case manager also mentioned that DCS "needed to get more information about what that counseling looked like to see if [the counseling Mother was attending] was sufficient or if [DCS] needed to [make a referral]." In other words, DCS prematurely petitioned to terminate Mother's parental rights when crucial information regarding counseling was necessary but not obtained. DCS did not establish that "all other efforts to preserve the relationship [had] failed." *Id.* at 192 ¶ 32.

**¶27**        The only reunification service DCS provided Mother during Child's dependency proceedings was visitation. Considering Mother's mental health situation and the evidence adduced at the termination hearing, more was required of DCS before termination could occur. The juvenile court erred in finding DCS made reasonable efforts to reunify Mother with Child.

## III.    Futility

**¶28**        Mother also argues that the juvenile court erred in determining that further reunification efforts would be futile. This court has previously held that DCS is not "obliged to undertake futile rehabilitative measures." *Id.* at 187 ¶ 1. However, "it is obliged to undertake [measures] which offer a reasonable possibility of success." *Id.* For the juvenile court to make a futility finding, DCS is required to "introduce clear and convincing evidence that additional services would have been futile." *Id.* at 193 ¶ 39. This heightened standard requires DCS to demonstrate that it is highly probable or reasonably certain that further services would be futile. *Kent K.*, 210 Ariz. at 284–85 ¶ 25; *Vanessa H. Ariz. Dep't of Econ. Sec.*, 215 Ariz. 252, 256 ¶ 18 (App. 2007).

**¶29**        The juvenile court erred in finding that further reunification efforts would have been futile. The record indicates, instead, that Mother could have benefitted from additional mental-health evaluations and treatment, neither of which she was offered during these proceedings. During the dependency proceedings, DCS relied primarily on the report issued after the 2020 psychological evaluation in fashioning reunification services. But DCS's testifying psychologist, who conducted the 2020 evaluation, agreed "Mother could benefit from an updated psychological

evaluation." Although Mother obtained her own *psychiatric* evaluation in 2023 (after DCS petitioned for termination), that evaluation did not address how Mother's mental health impacts her ability to parent. The 2023 evaluation, however, does support that Mother's mental health situation may have changed since 2020 because only one of the diagnoses contained therein (PTSD) was the same as those stemming from the 2020 evaluation.

**¶30**　　　　Not only did DCS fail to provide an updated psychological evaluation, it also failed to provide the services recommended after the 2020 evaluation it relies upon. Again, DCS's testifying psychologist agreed those services could have been helpful.

**¶31**　　　　DCS did not establish that Mother would have refused to participate in an updated psychological evaluation or subsequent mental-health services. DCS did not establish that Mother had refused or neglected services during the pendency of the dependency proceedings *in this case*. To the contrary, the sole reason DCS could present the juvenile court with any updated information about Mother's mental health status was because Mother took the initiative to obtain her own psychiatric evaluation. Having done so, we cannot say that DCS established a high probability that Mother would have refused to undergo an updated evaluation focused on her ability to parent or to undergo any recommended mental health treatment stemming from such an evaluation.

**¶32**　　　　DCS also did not establish with a high probability that Mother's mental health situation is such that she would not have benefited from such treatment. Although we understand that Mother has not adequately taken advantage of DCS services during prior termination proceedings, the circumstances to be considered for termination are those "at the time" of the termination hearing. *See Shella H. v. Dep't Child Safety*, 239 Ariz. 47, 50 ¶ 12 (App. 2016). The circumstances at the time of the hearing in this case did not clearly and convincingly establish a high probability that further reunification services would have been futile.

**CONCLUSION**

¶33      We vacate the juvenile court's termination order and remand for further proceedings consistent with this decision.



AMY M. WOOD • Clerk of the Court
FILED:   AGFV